IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMIE ROSE YOUNG,

*Plaintiff*,

v.                                                                  Civil Action No. ELH-12-3657

DONN SWINEY, et al.,

*Defendants*.

## MEMORANDUM OPINION

This suit arises from an automobile accident that occurred on June 16, 2010, involving, among others, Joseph Young and Donn Swiney.  Mr. Young sustained multiple injuries in the accident and, over two years later, on September 6, 2012, he committed suicide, at the age of 45. Thereafter, Mr. Young's widow, plaintiff Jamie Rose Young, filed suit, "individually and in her capacity as Personal Representative of the Estate of [Mr. Young], and as parent and legal guardian of Chelsea Lynn Young and Jenna Alexandra Young, minors," against Swiney; Swiney's employer, Industrial Transport Services, LLC ("Industrial Transport"); and Warehouse Services, Inc. ("Warehouse").  *See* ECF 2 (Complaint).[1]  However, in a Notice of Voluntary Dismissal filed January 10, 2013 (ECF 12), plaintiff dismissed her claims against Swiney and Warehouse.  *See infra*.  Thus, only Industrial Transport remains as a defendant.

Plaintiff subsequently filed a First Amended Complaint (ECF 30, the "FAC") and, like the original Complaint, it contains five counts: a survival action (Count I) and four wrongful

_____

[1] Plaintiff originally filed suit in the Circuit Court for Cecil County, Maryland.  ECF 2. On December 13, 2012, Industrial Transport and Warehouse removed the case to federal court based on diversity jurisdiction.  ECF 1 ¶ 9; *see* 28 U.S.C. § 1332.

death claims (Counts II through V).  *See id.*[2]  Count I, the survival action, is brought by plaintiff

in her capacity "as personal representative of the Estate of Joseph Russell Young[.]"  FAC at 3.

Based on Mr. Swiney's alleged negligence, Count I seeks judgment in the amount of

$3,000,000.00 for, among other things, Mr. Young's medical expenses; his physical and

emotional pain and suffering; his loss of income from the date of the accident until September 6,

2012; funeral expenses; interest; and costs of suit.  *Id.* at 2-3.  The remaining counts, Counts II

through V, all raise wrongful death claims, and seek $2,000,000 in damages.  Count II, originally

brought against Industrial Transport and Warehouse, and Count III, brought against Mr. Swiney,

both allege that Ms. Young "has suffered pecuniary loss, mental anguish, emotional pain and

suffering, and the loss of the society, companionship, comfort, protection, marital care, attention,

advice, counsel, and love of her husband."  In Count IV, plaintiff seeks, on behalf of her

daughter Chelsea Young, damages from all three defendants, based on Chelsea's "pecuniary

loss, mental anguish, emotional pain and suffering and other damages" due to the death of her

father.  Likewise, in Count V, plaintiff seeks, on behalf of her other daughter, Jenna Young,

damages from all three defendants, due to Jenna's "pecuniary loss, mental anguish, emotional

pain and suffering and other damages."

Notably, fault for the underlying motor vehicle accident is not at issue.  *See, e.g.*, ECF 32

(Industrial Transport's Motion for Partial Summary Judgment) at 1 ("Fault for the accident is

conceded").  Specifically, in the Notice of Voluntary Dismissal (ECF 12), the parties advised

that, "[i]n exchange for the voluntary dismissal" of all claims against Mr. Swiney and

Warehouse, "counsel for Industrial Transport Services, LLC has agreed to stipulate that Mr.

---

[2] Plaintiff filed the FAC well after dismissing Swiney and Warehouse from the suit. Nevertheless, the FAC continued to identify Swiney and Warehouse as defendants.  The only substantive difference between the original Complaint and the FAC is the amount of damages sought in connection with Count I.

Swiney was an employee of Industrial Transport Services, LLC at the time of the accident, and that Mr. Swiney was responsible for causing the collision that occurred on the night of June 16, 2010 with the vehicle that was driven by Plaintiff's decedent, Joseph R. Young." *Id.*; *see* ECF 13 (Order approving dismissal). Moreover, in its Reply, defendant does not challenge plaintiff's characterization of the accident or the nature and extent of Mr. Young's physical injuries. Rather, defendant maintains that "[s]uch 'evidence' . . . is not sufficient to support the wrongful death counts set forth in Counts II, III, IV and V of [the FAC]." Reply at 1.[3]

Now pending is Industrial Transport's Motion for Partial Summary Judgment (ECF 32), to which it has appended a supporting memorandum (ECF 32-1, "Mem.") (collectively, the "Motion"). Plaintiff has filed a "Response to Motion for Partial Summary Judgment" (ECF 36), as well as a supporting memorandum (ECF 37, "Opposition" or "Opp."). Defendant has replied (ECF 41, "Reply"). Both sides have also submitted numerous exhibits.[4]

---

[3] Among the FAC's four wrongful death counts, Industrial Transport is named as a defendant only in Counts II, IV, and V. Count III is brought only against Mr. Swiney, who has been dismissed from the suit, but neither party addresses that aspect of Count III in their briefing regarding defendant's Motion. Indeed, Industrial Transport seeks summary judgment as to Count III on the same grounds as the other three wrongful death claims—Counts II, IV, and V— and does not seek dismissal or summary judgment as to Count III on the ground that Mr. Swiney has been dismissed from the case.

Plaintiff also names Swiney as a defendant in Counts IV and V of the FAC. Similarly, despite Warehouse's dismissal, plaintiff names Warehouse as a defendant in Counts II, IV, and V. However, the Motion has been brought only by Industrial Transport because, as the docket reflects, Swiney and Warehouse have been dismissed from the suit.

[4] Defendant appended six exhibits to its Motion, including, *inter alia*, a Psychovocational Evaluation of Mr. Young, dated May 10, 2012 (Exhibit 2, ECF 32-3, the "Anderson Evaluation"); an Affidavit of Janet K. Anderson, Ph.D., dated Sept. 11, 2013 (Exhibit 3, ECF 32-4, "Anderson Aff."); an excerpt from the Deposition of Janet K. Anderson, Ph.D., Sept. 19, 2013 (Exhibit 4, ECF 32-5); and an Economic Loss Valuation report (Exhibit 5, ECF 32-6).

Plaintiff attached twenty-six exhibits to her Opposition, including, *inter alia*, an excerpt from the Deposition of Officer Michael Lewis, Sept. 19, 2013 (Exhibit A, ECF 37-1); an excerpt from the Deposition of Jamie Rose Young, July 23, 2013 (Exhibit B, ECF 37-2); an excerpt from the Deposition of Dr. Anderson (Exhibit D, ECF 37-4); the Supplemental Affidavit of Janet K.

Industrial Transport raises three arguments in its Motion.  First, defendant seeks summary judgment as to the four wrongful death claims (Counts II through V), asserting that plaintiff's evidence is insufficient as a matter of law to establish that Mr. Young's suicide on September 6, 2012, was proximately caused by the motor vehicle accident of June 16, 2010.  ECF 32 at 1-2.  Second, defendant maintains that it is "entitled to judgment as a matter of law as to any claimed economic loss occurring after September 6, 2012," on the ground that Mr. Young's suicide constitutes "a superseding and/or intervening cause" of his death that bars recovery for subsequent economic losses.  *Id.* at 2.  Defendant also raises a third challenge, arguing that no evidence exists indicating that the "decedent suffered pre-impact fright prior to the occurrence."  *Id.*  In other words, defendant seeks summary judgment as to Counts II through V in their entirety; regarding Count I, the survival action, defendant seeks to limit plaintiff's potential recovery, but does not move for summary judgment as to that count in its entirety.

---

Anderson, Ph.D., dated Dec. 4, 2013 (Exhibit E, ECF 37-5, "Anderson Supp. Aff."), to which an exhibit—a timeline—is attached; an excerpt from the Deposition of Joseph Capati, July 23, 2013 (Exhibit F, ECF 38-1); an excerpt from the Deposition of Jenna A. Young, July 23, 2013 (Exhibit G, ECF 38-2); an excerpt from the Deposition of Chelsea L. Young, July 23, 2013 (Exhibit H, ECF 38-3); an excerpt from the Deposition of Dr. Neil Blumberg, Oct. 2, 2013 (Exhibit I, ECF 38-4); a Singerly Fire Company report (Exhibit J, ECF 38-5); a Cecil County EMS report (Exhibit K, ECF 38-6); Christiana Hospital records, June 16-17, 2010 (Exhibit L, ECF 38-7); Christiana Hospital records, June 21, 2010 (Exhibit M, ECF 39-1); an operative report of Dr. Michael Franchetti, Feb. 23, 2011 (Exhibit N, ECF 39-2); an operative report of Dr. Joseph Jamaris, Oct. 14, 2011 (Exhibit O, ECF 39-3); a vocational assessment of Charles Smolkin, Sept. 6, 2012 (Exhibit Q, ECF 39-5); an excerpt from the Deposition of Bruce Kelly, Sept. 19, 2013 (Exhibit S, ECF 39-7); a report of Dr. Jamaris, Aug. 3, 2012 (Exhibit U, ECF 39-9); a report of Dr. Franchetti, July 26, 2012 (Exhibit V, ECF 39-10); a report of Dr. Franchetti, Mar. 8, 2012 (Exhibit W, ECF 39-11); a report of Dr. Anderson regarding Chelsea Young (Exhibit X, ECF 39-12); and notes and a report of Dr. Anderson regarding Jenna Young (Exhibit Y, ECF 39-13).

In addition, defendant attached four exhibits to the Reply: the Anderson Evaluation (Exhibit 1, ECF 41-1); Dr. Anderson's Affidavit (Exhibit 2, ECF 41-2); Dr. Anderson's Supplemental Affidavit (Exhibit 3, ECF 41-3); and an excerpt from the Deposition of Dr. Anderson (Exhibit 4, ECF 41-4).

With respect to defendant's third argument, plaintiff "consents to the entry of summary judgment [in favor of Industrial Transport] on the issue of whether the decedent suffered pre-impact fright prior to the occurrence."   ECF 36 at 2; *see also, e.g., Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [defendant's] argument" in dispositive motion, "the plaintiff abandons [her] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (plaintiff's failure to address in opposition brief an argument raised in defendant's opening brief constitutes abandonment of claim).   Accordingly, summary judgment will be entered in Industrial Transport's favor as to the issue of pre-impact fright.

No hearing is necessary to resolve the Motion.   *See* Local Rule 105.6; *see also* note 10, *infra*.  For the reasons that follow, the Motion will be granted in part and denied in part.

## I. Background[5]

On June 16, 2010, Mr. Young sustained serious injuries in a motor vehicle accident that occurred in Cecil County, Maryland.   *See* Opp. Exh. J (Singerly Fire Company report) at 2.   At the time of the accident, Mr. Young was 43 years of age, worked as a carpenter and a millwright, was married, and had two young daughters.   *See* Psychovocational Evaluation of Mr. Young, dated May 10, 2012 ("Anderson Evaluation") at 1.   Although defendant concedes that its employee was at fault, *see* ECF 32 at 1; Reply at 2, and does not dispute "that Mr. Young suffered certain physical injuries from the accident," Reply at 2, I will recount facts surrounding the accident and Mr. Young's resulting injuries, because the accident and the injuries are relevant to the claims.

_____

[5] The facts have been construed in the light most favorable to plaintiff.  In any event, the facts set forth in this section are undisputed, unless otherwise noted.

The accident occurred in Elkton, Maryland.  *See* Opp. Exh. J at 2.  While Mr. Young was stopped in his vehicle, a "full size pick up truck," Opp. Exh. J at 3, he was struck from behind by an eighteen-wheel tractor trailer truck.  Deposition of Officer Michael Lewis, Sept. 19, 2013 ("Lewis Dep.") at 10; Opp. Exh. K (Cecil County EMS report) at 3.  According to Bruce Kelly, another accident victim, the tractor trailer truck was traveling at a high rate of speed, "like he was going down I-95 or something."  Deposition of Bruce Kelly, Sept. 19, 2013, at 8; *see* Lewis Dep. at 10 (tractor trailer struck Mr. Young's vehicle at a "fairly high rate of speed").  Upon being struck from the rear by the tractor trailer truck, Mr. Young's truck "slammed into" the vehicle in front of his.  Opp. Exh. K at 3.

Following the accident, Mr. Young was transported to Christiana Hospital.  Opp. Exh. J at 3.  A report of the Singerly Fire Company, which responded to the scene, states, *id.*:

> This unit notified dispatch of a 4 vehicle [collision] involving an 18 wheeler and 3 pick-up trucks with 4 possible patients.  Shortly after [Mr. Young] was found to be stuck in his vehicle and not able to exit via normal egress due to the damage, injuries and position of the vehicles.  This patient was the driver in the first vehicle struck.  Patient's vehicle was a 4 door [D]odge full size pick up truck. Striking vehicle struck this vehicle in the rear doing substantial damage to the bed of the truck before continuing to strike the vehicle on the driver's side doing damage there and pushing the vehicle to the right.  This vehicle came to rest partially resting on the 18 wheeler's saddle tank.  This vehicle was also leaking fuel.  Upon gaining access to the patient via passenger side doors patient was found alert and oriented and complaining of neck pain, a laceration to the back of his head and pain to his left forearm.  At this time patient was placed in a c-spine colar [sic].  Patient stated that the last thing he remembers was being stopped in traffic and looking at [a] 7-11, he then doesn't remember any of the accident just waking up and the accident being over.  Due to patient['s] neck pain, [loss of consciousness] and [the] position of [the] vehicles the decision was made to remove the roof of the vehicle to make for a safe extrication.  Crews removed the roof completely and a backboard was placed behind the patient between him and the back of the seat.  Patient was then slid up the board by the crews, laid flat and secured.  Patient was then passed down to the stretcher and taken to the ambulance.  At this time [C]ecil [C]ounty paramedic 3 assumed patient care.

The Singerly Fire Company's report indicates that Mr. Young suffered from "Laceration-Head, Pain-Head, Pain-Arm(s)," with a "chief complaint" of "pain to the back of the head, Left forearm and upper neck." *Id.* at 1-2. Cecil County paramedics documented Mr. Young's loss of consciousness, "pain to back of head with controlled bleeding"; "pain to left forearm, which had deformity"; "some pain above right breast"; "some pain to lower left tib fib area"; and "some nausea." Opp. Exh K. at 2-4.

Christiana Hospital records dating from June 16 and 17, 2010, reflect a deformity in Mr. Young's left elbow area, dried blood on the back of his head, pain in the right chest and left wrist areas, and the earlier loss of consciousness, while noting that the patient was "awake, but confused." Opp. Exh. L. The records also note, *inter alia*, an "Admitting Diagnosis" of "Concussion." *See id.* Additional Christiana Hospital records, dating from June 21, 2010, reference a "scabbed wound" on the back of Mr. Young's head as well as pain in the head, neck, back, and left arm, and recommend further follow-up with his doctor. Opp. Exh. M.

Due to his injuries, Mr. Young was unable to return to carpentry and millwright work following the accident. His employer terminated him in December 2010, approximately six months after the accident, on the ground that it could no longer hold his position open. *See* Supplemental Affidavit of Janet K. Anderson, Ph.D., dated Dec. 4, 2013 ("Anderson Supp. Aff."), Exh. 1 (timeline attached as an exhibit to the Anderson Supp. Aff.).

Two months later, in February 2011, Mr. Young underwent a "[l]eft cubital tunnel release" surgery at Howard County General Hospital, described as an "ulnar nerve decompression at the elbow." Opp. Exh. N (operative report of Dr. Michael Franchetti, Feb. 23, 2011). Then, in October 2011, Mr. Young underwent an "elective cervical surgery to alleviate protracted and left-sided neck, head, and arm pain," which involved an anterior cervical

decompression, fusion, and plating of several vertebrae.   Opp. Exh. O (operative report of Dr.

Joseph Jamaris, Oct. 14, 2011); *see also* Deposition of Janet K. Anderson, Ph.D., Sept. 19, 2013

("Anderson Dep.") at 103; Anderson Supp. Aff., Exh. 1 (timeline).

On March 5, 2012, Mr. Young lost his health insurance.   Anderson Supp. Aff., Exh. 1.

Shortly thereafter, during a follow-up visit with his orthopedic surgeon on March 8, 2012, Mr.

Young reported "significant neck pain and radicular pain down his left arm," as well as

"numbness in his lateral elbow and lateral forearm."   Opp. Exh. W (report of Dr. Franchetti, Mar.

8, 2012) at 1.   At that time, Mr. Young remained out of work "due to his injuries."   *Id.*   He was

prescribed "physical therapy for rehabilitation of his cervical spine," but he was unsure whether

he would be able to receive the therapy "due to insurance considerations."   *Id.* at 2.

Subsequently, on May 10, 2012, Mr. Young met with Dr. Janet Anderson, Ph.D, at the

request of plaintiff's counsel.   *See* Anderson Evaluation at 1; Anderson Dep. at 35.   Dr.

Anderson is a psychologist who is licensed to practice in Maryland.   Affidavit of Janet K.

Anderson, Ph.D., dated Sept. 11, 2013 ("Anderson Aff.") ¶ 1.[6]   She is also a certified

rehabilitation counselor.   Anderson Dep. at 17.

Dr. Anderson has counseled individuals concerning, *inter alia*, suicide, insanity, delirium,

uncontrollable impulses, and depression.   Anderson Aff. ¶ 1.   She explained that, because her

"field" is "rehabilitation," many of the individuals with whom she has worked suffered from

"terrible chronic pain."   Anderson Dep. at 30.   Of relevance here, Dr. Anderson has "worked

with many post-injured people who were suicidal, and who ultimately did commit the act,"

---

[6] Dr. Anderson has been engaged in the practice of psychotherapy and counseling since 1980 and served as a Professor of Psychology at Towson University for twenty years. *Id.* At the time of her deposition, she was a member of the American Psychological Association and the National Rehabilitation Association. Anderson Dep. at 17-19. In addition, Dr. Anderson worked on a contract basis with the Social Security Administration between 1985 and 2000, reviewing files and testifying an average of once a week. Anderson Dep. at 15. She has testified as an expert in psychology before various Maryland trial courts. Anderson Aff. ¶ 1.

Anderson Supp. Aff. ¶ 9, including approximately ten to fifteen in her Social Security work and five in her private practice. Anderson Dep. at 30-32 (further noting that she has "tested a lot of people who ultimately committed suicide" but adding that "no actual therapy clients" of hers have done so). In the context of her Social Security cases, Dr. Anderson had been asked to provide her opinion as to whether a suicide was related to a prior motor vehicle accident. Anderson Dep. at 85. In such cases, the underlying accident typically preceded the suicide by several years. *Id.*

Mr. Young met with Dr. Anderson for the purpose of psychovocational testing on May 10, 2012. *See* Anderson Evaluation at 1. Dr. Anderson's aim was to assess "both his mental situation and his physical situation," Anderson Dep. at 36, "to determine his current functional abilities." Anderson Evaluation at 1. Prior to the meeting, Dr. Anderson reviewed Mr. Young's medical records. Anderson Dep. at 108-09. At the meeting, which lasted at least an hour and a half, *id.* at 38, Dr. Anderson interviewed Mr. Young and administered several psychological tests. Anderson Evaluation at 1. As of May 2012, Mr. Young had been married to his wife for 11 years. At that time, their daughter Chelsea was approximately 16 years of age, and their younger daughter, Jenna, was 13.[7]

Dr. Anderson noted that, due to the "ulnar nerve accident to [Mr. Young's] left arm and having a cubital tunnel release," Mr. Young experienced "numbness and tingling and severe pain in that arm and hand, which [was] his dominant hand." Anderson Evaluation at 7. She observed

---

[7] Dr. Anderson's May 2012 evaluation indicates Mr. Young reported that his daughters were 15 and 13 years of age. Anderson Evaluation at 2. However, other documents in the record state that his older daughter, Chelsea, was born on February 21, 1996, making her 16 by that time. *See* Mem. Exh. 6 (Economic Loss Valuation report); Opp. Exh. X (report of Dr. Anderson regarding Chelsea Young). Based on that February 1996 date of birth, Mr. Young's daughters, Chelsea and Jenna, would have been 16 and 14, respectively, at the time of his death on September 6, 2012. *See id.*; Opp. Exh. Y (notes and report of Dr. Anderson regarding Jenna Young, reflecting birthdate of June 18, 1998). These discrepancies are not material to the issues.

that, at the meeting, Mr. Young's left hand "was shaking" as he wrote answers to questions. Anderson Dep. at 41.  Mr. Young told Dr. Anderson that, "even working for 15 minutes with his hands causes a 'knife-like, dagger-like ripping feeling that hurts so bad that I have to just stop doing everything.'"  Anderson Evaluation at 5 (quoting Mr. Young).  She noted that, even after surgery, Mr. Young "cannot write for more than five minutes at a time without the pain increasing so much that it brings tears to his eyes."  *Id.* at 5.  Further, "an incomplete cervical fusion . . . ha[d] left him with numbness and pain in both hands and arms."  *Id.* at 7.  Mr. Young had also "been told that he ha[d] bulging disks in the lumbar area and may need surgery in that area."  *Id.* at 3.

During the meeting, Mr. Young told Dr. Anderson that he was "suicidally depressed." Anderson Evaluation at 5; *accord* Anderson Dep. at 52.  He also stated:  "I feel like a loser.  I can't work.  I can't support my family."  Anderson Dep. at 73.  Mr. Young discussed his family largely "in the context of his not being able to control his angry behavior," which he knew "was driving his wife and daughters away from him."  *Id.* at 74.

Mr. Young explained that "he and his wife began to fight bitterly when he no longer had a source of income, and his wife did not make enough money to support the family."  Anderson Evaluation at 2.  Mr. Young admitted "losing his temper and hollering at his daughter," and then "hat[ing] himself for it."  Anderson Dep. at 46.  Mr. Young felt "as if his marriage and his life [had] been destroyed," that there was "no hope for his future," and that he would "never be able to return to work."  Anderson Evaluation at 5.  Because of the accident and associated loss of income, Mr. Young said:  "'My whole family has been destroyed.'"  *Id.* (quoting Mr. Young).

At the time of the meeting on May 10, 2012, Mr. Young's wife and daughters had moved to Davie, Florida, where they remained for several months.  *See* Anderson Evaluation at 7;

Deposition of Jamie Rose Young, July 23, 2013 ("Jamie Young Dep.") at 34-35.   Mr. Young

told Dr. Anderson that he "felt personally responsible for driving his wife away . . . to Florida."

Anderson Dep. at 74.   While his wife and daughters were in Florida, Mr. Young lived with and

was supported by his adult stepson, Joseph Capati.   *See* Anderson Evaluation at 7.

Dr. Anderson concluded that Mr. Young was incapable of performing even light or

sedentary work, and thus was "totally and completely disabled" and "would never be able to

work again competitively." *Id.* She made a "very strong recommendation . . . that Mr. Young be

sent to counseling and psychotherapy so that he can deal with his very serious depression, which

is suicidal at times." *Id.* Dr. Anderson also issued a "second strong recommendation," that Mr.

Young "be referred to a weight loss group" due to his "compulsive overeat[ing]" and "obesity."

*Id.*[8]

Three weeks after the meeting with Dr. Anderson, Mr. Young's orthopedic surgeon, Dr.

Franchetti, concluded that, "'within a reasonable degree of medical certainty and probability, as a

result of his injuries of June 16, 2010, the patient will not be able to return to his previous

occupation as a maintenance contractor and carpenter, and his inability to do so is a direct result

of his June 16, 2010 injuries.'" Opp. Exh. Q (vocational assessment of Charles Smolkin, Sept. 6,

2012) at 2 (quoting report of Dr. Franchetti, May 31, 2012).   Unlike Dr. Anderson, Dr. Franchetti

opined that Mr. Young "'obviously will be employable for a less strenuous occupation,'" and

thus "'order[ed] a Functional Capacity Evaluation to assess his functional capacities.'"   *Id.*

(quoting report of Dr. Franchetti, May 31, 2012).

A functional capacity evaluation was performed at Metropolitan Occupational Therapy

on June 21, 2012.   *See* Opp. Exh. Q.   Although it is unclear whether that evaluation identified

---

[8] The parties do not indicate whether Mr. Young pursued or received any of the
counseling, therapy, or other interventions that Dr. Anderson recommended.

any types of work that Mr. Young remained capable of performing, the evaluation stated: "'IT IS UNLIKELY THAT MR. YOUNG WOULD BE ABLE TO SAFELY OR EFFICIENTLY PERFORM HIS PREVIOUS JOB AT HIS CURRENT LEVEL OF FUNCTIONING.'" *Id.* at 2 (quoting evaluation).

One month later, during a visit with his orthopedic surgeon on July 26, 2012, Mr. Young reported "persistent neck pain," "back pain and some left lower extremity radicular pain," and "pain in his ulnar nerve distribution of his left upper extremity." Opp. Exh. V (report of Dr. Michael Franchetti, July 26, 2012). On August 3, 2012, Mr. Young's neurosurgeon determined that "continued neck and upper back symptoms" may "eventually require surgical intervention[.]" Opp. Exh. U (report of Dr. Jamaris, Aug. 3, 2012).

On August 27, 2012, Charles Smolkin performed a Vocational Assessment of Mr. Young. Opp. Exh. Q. He concluded that Mr. Young "suffered multiple injuries on June 16, 2010 which preclude return to his occupation as a Millwright/Carpenter or any occupation which requires above a Light exertion," *id.* at 3, and his "significant physical limitations, pain, depression and the lack of a high school diploma make him a poor prospect for successful return to work." *Id.* at 4. As such, Smolkin "recommend[ed] that Mr. Young receive individualized tutoring at a cost of approximately $2,000 as soon as possible . . . ." "After successful completion of his G.E.D.," Smolkin opined, Mr. Young could work as a security guard, although likely only on a part-time basis due to his symptoms. *Id.* Smolkin observed: "Mr. Young appeared quite distressed over his inability to continue in his Carpenter/Millwright work because of his physical limitations and continuing pain." *Id.* at 2.

The impressions of Mr. Young's family members are also pertinent. For their part, Mr. Young's daughters reported that their father had undergone "a complete personality change"

following the accident.   Anderson Dep. at 92.   Once, while driving with his stepson, Joseph Capati, over the Chesapeake City Bridge, Mr. Young remarked that he had been "thinking about driving off the bridge."   Deposition of Joseph Capati, July 23, 2013 ("Capati Dep.") at 15-17. On another occasion, at some point after his wife and daughters had moved to Florida for several months, his stepson overheard him "mentioning jumping off of the bridge" to someone on the phone.  Capati Dep. at 25-26.

With respect to Mr. Young's suicide on September 6, 2012, the principal sources of information are four members of Mr. Young's family, who were with him for various periods during the evening before his death.  Notably, although Mr. Young's wife and two daughters had temporarily moved to Florida in 2012, at the time of his suicide they had returned to the family's home in Maryland. *See* Jamie Young Dep. at 34-36.

Mr. Young's younger daughter, Jenna, was 14 at the time of her father's death.   She recounted:  "I remember my dad making fun of me, because, like, he always, like, made fun of me for, like, my weight or something.  [B]ut that's just like him, like he was just cracking jokes." Deposition of Jenna A. Young, July 23, 2013 ("Jenna Young Dep.") at 12.  She continued, *id.*: "And then I remember getting upset about that.  But then I went into my room.  And that's all I remember."  Jenna did not recall her father saying anything that would have suggested he "was depressed enough to commit suicide."  *Id.*

Chelsea, Mr. Young's older daughter, returned from work to the family's home that evening.   At the time, she was arguing with her boyfriend, Izzy, "about something little." Deposition of Chelsea L. Young, July 23, 2013 ("Chelsea Young Dep.") at 20-21.   Chelsea testified, *id.* at 21-22:

> And then my dad came.  And he was just saying that we need to stop.  And it kind of got me mad that he was, like, up in our business, you know.  But then he went back in the room and went to watch the Cowboys game.
>
> Me and Izzy had calmed down, but I guess I was still mad at my dad, 'cause I was like, oh, my God.  Like, why is he in our business?  Pretty much that's what I was thinking.
>
> And then I don't know how it even, like, started.  I think it was over my work.  Like, I would -- I threw it in [Mr. Young's] face.  "That's why you need me to work."
>
> *   *   *
>
> And I said something like about me working.  And I didn't understand his situation completely . . . .  I didn't know that he wasn't, like, really allowed to work . . . .  I guess I kind of threw it in his face.  I was like, "You need to get a job," and stuff.
>
> And he just went ballistic.  And, like, he just went really ballistic.  And he was, like, arguing with me.  And then I remember at one point of the night he tried to say sorry.  And I kept going.  I don't know why.  I mean, I was so mad[] at him.
>
> So he went back in his room to watch the rest of the game.  Then he came out to apologize to me and Izzy.  And I was just like, "No.  That's not cool.  You don't yell at me like that."

Chelsea also recalled her father having "a can or two or three" of beer around that time.  *See*

Chelsea Young Dep. at 23.

When Ms. Young returned to the family's home that evening, "the argument kept going."

*Id.*  As Chelsea testified, *id.* at 23-25:

> Izzy got, like, really worked up.  He also has, I guess, like adrenaline pumping or whatever, because he didn't like seeing my dad yell at me.  And he was, like, mad or something.  And then he fell into the door.  Like, he was just shaking mad.  And I guess he got so hyped he fell into the door.  And his arm had shards of glass puncturing, like going into his arm.[9]
>
> *   *   *

---

[9] Although the cause of Izzy's fall is not clear from the record, it appears that the fall and the resulting injury were accidental.

> We called [Izzy's] mom to come pick me and him up. But my dad didn't want me to be at his house alone. Pretty much he didn't like that. I tried to explain to him that we weren't going to do nothing.

> But so the argument over that was pretty pathetic. But Izzy's mom didn't want to leave without Izzy. And Izzy didn't want to leave without me. And my dad was not going to let me leave. So that was pretty much the whole tie-up. So that's the only reason why my mom went with me. My sister and my mom went with me to his house.

Izzy's mother, Tonya, called the police to the Youngs' home. Chelsea Young Dep. at 25. A police officer arrived while Mr. Young's wife and daughters were still present. *See* Jamie Young Dep. at 38. Ms. Young testified that she went to the home of Chelsea's boyfriend, Izzy, because she "didn't really have anyplace else to go immediately." *Id.* According to Dr. Anderson, Ms. Young told her that she "asked [the police] to stay or put [Mr. Young] in lock up or something because she was so worried because he was so upset." Anderson Dep. at 102. Nevertheless, according to Ms. Young, her husband did not say anything to her that evening that suggested he may commit suicide. Jamie Young Dep. at 38.

Joseph Capati, Mr. Young's adult stepson, who lived at the Chesapeake City home, was also present that evening. He remained at home after the argument and was aware that, at some point, Mr. Young had gone to his room. Capati Dep. at 23. However, the two did not speak following the argument. Mr. Capati testified that he did not hear anything that would have "tipped [him] off," but noted that Mr. Young's room was at the opposite end of the house from his own. *See id.* at 23-24. When asked whether Mr. Young said or did "anything that night that gave [him] a clue that he might be committing suicide that night," Capati said no. *Id.* at 24.

That night, Mr. Young committed suicide by ingesting a combination of alcohol, Flexeril (a muscle relaxant), and Tramadol (a pain medication). *See* Deposition of Dr. Neil Blumberg, Oct. 2, 2013 ("Blumberg Dep.") at 56-57; Anderson Dep. at 89. Flexeril and Tramadol were

among the medications that Mr. Young reported taking as of May 2012.  *See* Anderson Evaluation at 2.  The alcohol likely exacerbated the depressive effect of the Flexeril and Tramadol.  Blumberg Dep. at 56.  In a suicide note, Mr. Young twice referred to himself as a "loser."  *See* Blumberg Dep. at 59; Anderson Dep. at 72-73.  Mr. Young's body was not found until Ms. Young returned home the next day.  *See* Capati Dep. at 23.

Following Mr. Young's suicide, Dr. Anderson's role in the case expanded, as she was "asked to render an opinion as to whether or not at the time of [Mr. Young's] suicide he was suffering from a psychotic break with reality."  Anderson Supp. Aff. ¶ 2.  To that end, Dr. Anderson reviewed a litany of records, including various medical and emergency response records; Mr. Young's autopsy; the depositions of Jamie Rose Young, Chelsea Young, Jenna Young, and Joseph Capati, all family members of Mr. Young who were with him the evening prior to his suicide; and a "police accident report and photographs."  Anderson Aff. ¶ 2; *see also* Anderson Supp. Aff. ¶ 2 (detailing Dr. Anderson's sources of information).  In addition to meeting with and performing tests on Mr. Young prior to his death, Dr. Anderson later met with his wife and two daughters, administering psychological evaluations on them, and visited the scene of the suicide in Chesapeake City, Maryland.  Anderson Aff. ¶ 2; Anderson Supp. Aff. ¶ 2.

Dr. Anderson opined:  "It is my opinion based upon a reasonable degree of psychological certainty that the suicide of Joseph Russell Young, the decedent, was directly and proximately caused by the psychosis he sustained as a result of the automobile accident of June 16, 2010, which is the subject of this action."  Anderson Aff. ¶ 3.  According to Dr. Anderson, her opinions were based on various sources of information, including those identified above, as well as her training, knowledge, and experience in the field of psychology.  *Id.* ¶ 2.

Additional facts are included below.

## II.  Summary Judgment

Defendant's Motion is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" establishing a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *accord Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  In other words, the non-moving party must show disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

In resolving a summary judgment motion, the court may not make credibility determinations. *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006). Moreover, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587; *see Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721

F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there exists a dispute of material fact that precludes summary judgment. *Id.* at 248.

### III. Experts

By way of its summary judgment motion, defendant has challenged the expert opinion offered by plaintiff. Although parties may challenge expert testimony pursuant to Fed. R. Evid. 702 via a so-called *Daubert* motion, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts have also addressed challenges to the admissibility of expert testimony in the context of a motion for summary judgment. *See, e.g.*, *Selective Ins. Co. v. Empire Comfort Systems*, 2007 WL 7681251, at *2-3 (D. Md. Mar. 21, 2007); *Heaps v. General Motors Corp.*, 2006 WL 2456231, at *3-5 (D. Md. Aug. 22, 2006); *see also Campbell v. Fawber*, --- F. Supp. 2d ----, 2013 WL 1330153, at *2 (M.D. Pa. Mar. 29, 2013).[10]

---

[10] In each Maryland case, the district court judge ruled without a hearing. *See Selective Ins. Co.*, 2007 WL 7681251, at *1; *Heaps*, 2006 WL 2456231, at *1. Although defendant has requested "a hearing on all matters herein," ECF 32 at 4, the Motion is a summary judgment motion, not a classic *Daubert* motion. Indeed, neither party cites *Daubert* in the submissions. Moreover, a *Daubert* hearing is "not mandated in all cases and, as a general matter, trial judges have significant discretion in determining the admissibility of expert opinion." *Dent v. Siegelbaum*, 2012 WL 718835, at *10 (D. Md. Mar. 5, 2012) (Chasanow, J.); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The trial court must have [discretionary] latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable."); Local Rule 105.6 ("Unless otherwise ordered by the Court . . . all motions shall be decided on the memoranda without a hearing.").

In some instances, a party challenging expert testimony at the summary judgment stage will raise, in addition to the summary judgment motion, a motion to strike or exclude the expert

Under Federal Rule of Evidence 104(a), the court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence," including the admissibility of expert testimony under Federal Rule of Evidence 702. In their briefing, both parties make reference to Fed. R. Evid. 702. Mem. at 11; Opp. at 12. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 permits a properly qualified expert witness to testify regarding technical, scientific, or other specialized knowledge in a given field if it would assist the trier of fact in understanding the evidence or to determine a fact in issue. The rule "was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "The party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011); *see Daubert*, 509 U.S. at 590; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Maryland Casualty Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998); *Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (Grimm, J.).

In *Daubert*, 509 U.S. at 597, the Supreme Court held that scientific evidence is admissible under Rule 702 if "it rests on a reliable foundation and is relevant." The Supreme

---

testimony at issue. *See, e.g.*, *Muse v. Supervalu Inc.*, 2011 WL 1980607, at *1 (D. Md. May 20, 2011) (Connelly, M.J.). Defendant has not done so here.

Court explained that expert scientific testimony must be grounded "in the methods and procedures of science," and it must be something more than subjective belief or unsupported assumptions. *Id.* at 589-90.  Moreover, the evidence or testimony must be relevant to the extent that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591; *see also United States v. Forrest*, 429 F.3d 73, 80-81 (4th Cir. 2005).  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court extended the principles pertaining to scientific expert testimony to other expert testimony requiring technical or specialized knowledge.

As indicated, to satisfy the admissibility requirements of Rule 702, an expert's opinion must be "based upon sufficient facts or data."  Fed. R. Evid. 702.  An expert must also opine based on reliable principles and methods, applied reliably to the facts.  In *Benedi v. McNeil-P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir. 1995), the Fourth Circuit recognized that "epidemiological studies are not necessarily required to prove causation," but a proposed expert must show that "the methodology employed . . . in reaching his or her conclusion is sound."

Under *Daubert*, the trial court serves as the gatekeeper, making a pretrial determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. at 592-93.  This gatekeeper role helps to ensure that the jury hears reliable and relevant evidence that will assist the jury in factual determinations, clarify issues, and has probative value.  *Id.* at 596.  As to reliability, *Daubert* articulated five factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology:  (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards

controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003).

As a whole, the factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  But, the factors are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case. *Id.* at 151.  Indeed, the Supreme Court has said that the factors are not a "checklist." *Id.* at 150.  Regardless, the court "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).

With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony. *See Kumho Tire*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Smith v. Central Admixture Pharm. Servs., Inc.*, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.*, 1999 WL 1489199 (D. Md. Dec. 30, 1999))).

In addition, "evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261.  However, to be admissible, the expert testimony need not be "'irrefutable or certainly correct.'"  *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (citation omitted); *see Daubert*, 509 U.S. at 596; *Westberry*, 178 F.3d at 261.  Rather, the proponent must show that it is reliable.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3rd Cir. 2000).  In other words, the Supreme Court did not intend the gatekeeper role to "supplant the adversary system or the role of the jury:  '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596); *see Moreland*, 437 F.3d at 431 (recognizing that "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.").

Nevertheless, a court will exclude testimony based on "belief or speculation," *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999), or when not supported by the record. *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *Casey*, 823 F. Supp. 2d at 340. Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  And, a court may exercise its "discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered.'" *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).

### IV.  Wrongful Death Claims

Industrial Transport argues that it is entitled to summary judgment as to Counts II through V, the wrongful death claims.  In particular, defendant maintains that, as a matter of law, Mr. Young's suicide "was not proximately caused by the motor vehicle accident occurring on June 16, 2010 . . . ."  Mem. at 1.  In its view, under Maryland law, a motor vehicle accident can be the proximate cause of a suicide only under limited circumstances that are absent in this case.  *Id.* at 2.  Plaintiff counters that Dr. Anderson's testimony "stems from reliable methodology, a sufficient factual basis, and a reliable application of the methodology to the facts."  Opp. at 16.

Regarding the substantive law governing plaintiff's wrongful death claims, it is apparent that Maryland law applies.  A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules.  *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007).  The parties have presented their arguments under Maryland law, albeit without expressly discussing the issue of choice of law.  In tort cases, Maryland courts apply the law of the state where the alleged tort occurred, and in this case the underlying accident (as well as the suicide) occurred in Maryland.  *See Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).  As such, I will also apply Maryland law.

Maryland's wrongful death statute is found in Md. Code (2013 Repl. Vol.), §§ 3-901 through 3-904 of the Courts & Judicial Proceedings Article ("C.J.").  Section 3-902, titled "Liability notwithstanding death," provides that wrongful death actions "may be maintained against a person whose wrongful act causes the death of another."  C.J. § 3-902(a).  "[A] wrongful death action is brought by the relatives of the decedent, seeking recovery for their loss as a result of the victim's death."  *Jones v. Prince George's Cnty.*, 541 F. Supp. 2d 761, 764 (D.

Md. 2008) (citation omitted).  Such an action "'is brought in the name of a person entitled to

recover . . . .'"  *Williams v. Work*, 192 Md. App. 438, 452, 995 A.2d 744, 753 (quoting *Walker v.*

*Essex*, 318 Md. 516, 523, 569 A.2d 645, 648 (1990)), *aff'd sub nom. Ace American Ins. Co. v.*

*Williams*, 418 Md. 400, 15 A.3d 761 (2011).  *See Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d

1097, 1102 (1997) (a wrongful death action "is brought by a spouse, parent, or child, or a

secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or

her own loss accruing from the decedent's death"); *United States v. Streidel*, 329 Md. 533, 536,

620 A.2d 905, 907 (1993); C.J. § 3-904(d) ("damages awarded . . . are not limited or restricted

by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish,

emotional pain and suffering, loss of society, companionship, comfort, protection, marital care,

parental care, filial care, attention, advice, counsel, training, guidance, or education where

applicable for the death of . . . (1) A spouse . . . (3) A parent of a minor child . . . .").

Regarding proof of causation in the context of a wrongful death claim, then-Magistrate

Judge Grimm explained in *Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012):

> To succeed on a wrongful death claim under Maryland law, a plaintiff
> who qualifies as a beneficiary under the wrongful death statute "must show by a
> preponderance of the evidence that the conduct of [the] defendant was negligent
> and that such negligence was a proximate cause of the death of the decedent."
> *Weimer* [*v. Hetrick*, 309 Md. 536, 554, 525 A.2d 643, 652 (1987)]; *United Elec.*
> *Light & Power Co. v. State*, 100 Md. 634, 60 A. 248, 248-49 (1905); *see*
> *also* [Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in*
> *Maryland* 396 (4th ed. 2008)] (listing four elements that a plaintiff must prove to
> succeed on a wrongful death claim: (1) the victim's death; (2) that the victim's
> death was proximately caused by the negligence of the defendant; (3) that the
> victim's death resulted in injury to the plaintiff, who falls within the category of
> beneficiaries defined by the statute; and (4) that the claim is brought within the
> applicable statutory period) . . . .

Nonmoving parties must "'produce competent evidence on each element of [their] claim' to

survive the motion for partial summary judgment."  *Osunde*, 281 F.R.D. at 260 (quoting *Miskin*

*v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)) (modification in *Osunde*).

The parties agree that, in the context of this case, the relevant standards regarding proof of causation are found in the case of *Sindler v. Litman*, 166 Md. App. 90, 887 A.2d 97 (2005). *See, e.g.*, Mem. at 7-10; Opp. at 12-14.   *Sindler* arose from a motor vehicle accident in 1994, involving Ms. Sindler and her husband.  Ms. Sindler sustained minor physical injuries as a result of the accident.  166 Md. App. at 106, 887 A.2d at 106.  In 1997, the Sindlers sued both the driver of the other vehicle and the driver's husband.  *Id.* at 99, 887 A.2d at 102.  In July 2004, several months before trial, Ms. Sindler committed suicide.  *Id.*  Subsequently, her husband filed an amended complaint, adding wrongful death and survival claims, alleging that the accident caused his wife's death.  *Id*. at 103, 887 A.2d at 104.

Prior to trial, the circuit court granted summary judgment in favor of the defendants as to the wrongful death claim.  *Id*. at 99, 887 A.2d 102.[11]  In particular, the defendants argued before the trial court that "suicide is not a legally cognizable basis for a wrongful death claim because it is barred as a matter of law," and that the evidence in the case did not support such a claim.  *Id.* at 103, 887 A.2d at 104.   At a hearing on the summary judgment motion, the trial court considered deposition testimony from Ms. Sindler and from plaintiff's expert, Dr. Gary Lefer, who was Ms. Sindler's treating psychiatrist at the time of her death.  *Id.* at 104, 108, 119, 887 A.2d at 105, 107, 114.  In the trial court's view, Dr. Lefer's deposition testimony addressed "the possibility of suicide" only "in general terms," which were "insufficient to maintain a cause of action" for wrongful death.  *Id.* at 107, 887 A.2d at 106.

---

[11]  The jury returned a verdict in the plaintiff's favor as to the survival and loss of consortium claims, but the trial court granted a defense motion to dismiss the entire case due to discovery violations.  166 Md. App. at 99, 887 A.2d at 102.  Although that issue was addressed on appeal, it was not relevant to the analysis of the wrongful death claim.

On appeal, the Maryland Court of Special Appeals affirmed the entry of judgment for the defendants as to the wrongful death claim. As an initial matter, the court addressed the relevant legal standards when a wrongful death claim arises from a suicide. Under one approach, "courts have held that suicide is a common law crime and, as such, it is a *per se* bar to a wrongful death claim." 166 Md. App. at 109, 887 A.2d at 108. In order to commit common law suicide, one must: "(1) take his own life; (2) be 'of years of discretion;' and (3) be of 'sound mind.'" *Id.* (quoting *Wackwitz v. Roy*, 244 Va. 60, 65, 418 S.E.2d 861 (1992)). Under this "*per se*" standard, a court will "analyze the question of liability for suicide by determining whether the person who took his/her own life was sane within the meaning of common law suicide." 166 Md. App. at 110, 887 A.2d at 108 (citing *Wackwitz*, 244 Va. at 65-66, 418 S.E.2d 861). However, as the *Sindler* Court observed, the reasoning of Virginia and Fourth Circuit decisions endorsing the *per se* approach was grounded in the fact that suicide had remained a common law crime in Virginia. *Id.* at 110, 887 A.2d at 108 (citing *Wackwitz*, 244 Va. at 65-66, 418 S.E.2d 861). By contrast, the *Sindler* Court said, "it is questionable at best whether Maryland recognizes suicide as a common law crime." 166 Md. App. at 111, 887 A.2d at 109 (citing *Wilmington Trust Company v. Clark*, 289 Md. 313, 328, 424 A.2d 744, 754 (1981) ("Suicide is no longer a crime either in England or the majority of American jurisdictions, and no American jurisdiction punishes a suicide through forfeiture of goods or any other means."); *Mayne v. State*, 45 Md. App. 483, 488, 414 A.2d 1, 4 (1980) (declining to address whether suicide is a crime in Maryland)).

A second approach, identified by the *Sindler* Court as the "majority view," holds that "suicide, as a consequence of a negligent act, is not legally cognizable under general principles of proximate causation, either because it is a superseding intervening cause or otherwise not a proximate cause." 166 Md. App. at 111, 887 A.2d at 109. That general rule, however, is subject

to an exception, reflected in the Restatement (Second) of Torts ("Restatement"), § 455. *Id.*

Specifically, § 455 ("Acts Done During Insanity Caused by Negligent Conduct") states:

> If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity
>
> > (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or
> >
> > (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

Characterizing the issue as "one of first impression in Maryland," the *Sindler* Court found

"the majority approach, based on principles of proximate cause, to be more persuasive." 166

Md. App. at 112, 887 A.2d at 109. Indeed, it rejected the *per se* rule and expressly "adopt[ed]

the Restatement approach, which is simply a statement of proximate cause in a specific context."

*Id. See also, e.g.*, *District of Columbia v. Peters*, 527 A.2d 1269, 1276 (D.C. 1987) (adopting §

455 standard); *Baxter v. Safeway Stores, Inc.*, 13 Wash. App. 229, 232-33, 534 P.2d 585, 588

(1975) (same); *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 524 (Tex. 1975) (same); *Fuller v.

Preis*, 35 N.Y.2d 425, 429, 322 N.E.2d 263, 265 (1974) (same).

Further, the *Sindler* Court observed, *id.* at 112-13, 887 A.2d at 109-10:

> Under the proximate cause analysis, the general rule is that "one may not recover damages in negligence for the suicide of another. The act of suicide is generally considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death." *E.g.*, *Peters*, 527 A.2d at 1276 (citing *McLaughlin* [*v. Sullivan*, 123 N.H.335, 337, 461 A.2d 123, 124 (1983)]); *see also Cleveland v. Rotman*, 297 F.3d 569, 572 (7th Cir. 2002) ("It is well-established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee."); *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990) ("Generally speaking, it has been said, the act of suicide is viewed as 'an independent intervening act which the original tortfeasor could not have reasonably [been] expected to foresee.'" (Citations omitted)); *Jamison v. Storer*

*Broadcasting Co.*, 511 F. Supp. 1286, 1292 (E.D. Mich. 1981) ("If a person commits suicide in response to a mental condition, as distinguished from a mental illness, a prior tortfeasor, perhaps in part responsible for that condition, will not be liable because the act of the deceased is viewed as an independent intervening cause.") . . . .

The court reiterated that § 455 of the Restatement "provides an important exception to the general rule that suicide is a superseding intervening act or, in any event, that the negligent act was not the legal or proximate cause of the suicide." 166 Md. App. at 117, 887 A.2d at 112 (citing *Peters*, 527 A.2d at 1275). In essence, this provision "assumes that negligent conduct caused delirium or insanity of another and addresses the question as to when the negligent actor is liable for suicide committed by the delirious or insane person." 166 Md. App. at 117, 887 A.2d at 112. As to § 455, the *Sindler* Court further explained, *id*. at 117-18, 887 A.2d at 112-13:

> Under the Restatement exception, "a plaintiff must show more than that the alleged negligent incident started a chain of circumstances that led to suicide." *Peters*, 527 A.2d at 1276. The plaintiff must prove that the defendant's action caused insanity, which prevented the decedent from realizing the nature of the act of suicide or resulted in the decedent's having an uncontrollable impulse to commit suicide, "in the sense that the decedent could not have decided against and refrained from killing himself, and because of such uncontrollable impulse, the decedent committed suicide." *Id.* (quoting *Orcutt* [*v. Spokane County*, 58 Wash.2d 846, 853, 364 P.2d 1102, 1105 (1961)]).

As the *Sindler* Court noted, 166 Md. App. at 118, 887 A.2d at 113, the comments to § 455 provide further guidance. "Comment on Clause (a)" states:

> Clause (a) is applicable when the other's insanity is so extreme as to prevent him from understanding what he is doing or, if he understands what he is doing, from understanding its inevitable or probable consequences. It also applies to acts done during delirium.

The appellate court then referred to the "Comment on Clause (b)," *id.*, which provides:

> This Clause applies where the other's insanity does not deprive him of his capacity to realize the nature or consequences of his act or from forming a purpose to kill or cause harm to himself and selecting means appropriate to accomplish his purpose, but his act is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his

actions. It, therefore, includes acts done under insane delusions if they are sufficiently strong to preclude resistance by such reason as his insanity leaves to the person laboring under them.

In addition, the *Sindler* Court quoted "Comment d," *id.*, which states as follows:

On the other hand, the fact that the actor's negligence causes harm to another which subjects him to recurrent attacks of extreme melancholia does not make the actor liable for death or other harm which the other deliberately inflicts upon himself during a lucid interval in an effort to terminate his life because of his dread of the increasingly frequent recurrence of these attacks.

Regarding proximate causation in the context of liability for suicide, the *Sindler* Court also quoted from a case citing a passage from Prosser, Torts § 49 (2d ed. 1955), as follows, 166 Md. App. at 118-119, 887 A.2d at 113:

Although there are cases to the contrary, it seems the better view is that when [the injured person's] insanity prevents him from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable . . . . But if the suicide is during a lucid interval, when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supercedes the defendant's liability.

After analyzing these authorities, the *Sindler* Court observed that "whether Ms. Sindler was insane or delirious and that suicide resulted, not from her own voluntary conduct, but from lack of realization or an 'uncontrollable impulse' that was the product of insanity created by appellees, was a jury question that required expert testimony." 166 Md. App. at 119, 887 A.2d at 113. However, the Maryland Court of Special Appeals concluded that, when summary judgment was entered in favor of the defendants, "the evidence was insufficient to sustain a finding of liability for the suicide of Ms. Sindler under the Restatement." *Id.*, 887 A.2d at 113-14. Both Dr. Lefer's report and deposition dated from early 2004, *before* Ms. Sindler's suicide. *Id.*, 887 A.2d at 114. Ms. Sindler first consulted Dr. Lefer in January 2002, and subsequently met and spoke with him on several other occasions. *Id.* at 119-20, 887 A.2d at 114. Although Ms. Sindler

reported periods of "'severe suicidal ideation,'" Dr. Lefer opined in early 2004 that he "'d[id] not feel the patient pose[d] an imminent suicidal risk'" and found no evidence of psychosis.  *Id.* (citing generally to Dr. Lefer's report and deposition).   At his April 2004 deposition—taken several months before Ms. Sindler's suicide—Dr. Lefer testified that although he "did not think Ms. Sindler presented an active risk of suicide" at the time of their initial meeting, he believed that "she would need someone such as himself to call to monitor her 'suicidality' because 'there's a significant risk that she'll take her life.'"  *Id.* at 120-21, 887 A.2d at 114.

The *Sindler* Court acknowledged:  "Dr. Lefer testified that Ms. Sindler exhibited organic brain syndrome that caused depression.  He also indicated that she was a suicide risk."  166 Md. App. at 121, 887 A.2d at 115.  Critically, however, "given the date of his report and deposition, he could not have and did not opine that the suicide was caused by the accident."  *Id.*  Further, "Dr. Lefer did not opine that Ms. Sindler was insane or otherwise was in a mental state such that she did not realize the nature and risk of her act of suicide or that she had an uncontrollable impulse or anything sufficiently close to the Restatement test to create a jury question."   *Id.* Therefore, the appellate court affirmed the trial court's order granting summary judgment to the defendants on the wrongful death claim.  166 Md. App. at 121-22, 887 A.2d at 115.

In this case, Industrial Transport asserts that plaintiff's "evidence that her husband was depressed and upset following the June 2010 accident . . . does not meet the legal standard in Maryland as concerns a causal connection between an accident and a subsequent suicide."  Mem. at 2.  According to defendant, Dr. Anderson's testimony concerning Mr. Young's mental state at the time of his suicide "is insufficient to create an issue of fact, as she has no foundation for such an opinion."  ECF 32 at 2.

In her Affidavit, Dr. Anderson set forth the foundation for her conclusions as to Mr. Young's mental state, *id.* ¶ 2:

> I make this affidavit after my review of the following records: Singerly Fire Company ambulance report of June 16, 2010; Christiana Hospital of June 16, 2010 and June 21, 2010; Susan Liu, M.D. from June 28, 2010 through October 8, 2010; Arthur Kurlanzik, M.D. from July 1, 2010 through April 26, 2012; Michael Franchetti, M.D. from July 29, 2010 through July 26, 2012; Scott T. Irrgang, D.C., CCSP from March 14, 2011 through June 1, 2011; Joseph K. Jamaris, M.D[.] through August 3, 2012; Alan P. Scheiner, D.C. from June 22, 2010 through September 13, 2010; Kanchan D. Kotak, M.D. through October 12, 2011; Kathryn Nicholson, P.T., FCE of June 21, 2012; Howard County General Hospital of February 23, 2011 and October 14, 2011; Charles Smolkin, CRC, CVE, CDMS, CCM, Vocational Assessment report of August 27, 2012; and, the autopsy report dated September 7, 2012. I have also reviewed the deposition transcripts of Jamie Rose Young, Chelsea Young, Jenna Young and Joseph Capati as well as the police accident report and photographs. I have also met with and tested the decedent, Joseph Russell Young, prior to his suicide, and have met with and tested his wife, Jamie Rose Young and his two daughters, Chelsea Young and Jenna Young. The tests administered were complete psychological evaluations, including intelligence, academics, testing for any type of brain injury or disability, and for any psychological problems. Specific tests included: Wechsler Adult Intelligence Scale; the Wide Range Achievement Test; the Bender Gestalt and its recall; the Symptom Check List; and various projectives. My opinions are based upon all of the above and the familiarity of the subject matter as well as my training, knowledge and experience in the psychological field as set forth in the attached Curriculum Vitae.

Dr. Anderson's conclusions regarding Mr. Young's suicide are reflected in ¶¶ 3-7 of her Affidavit:

> It is my opinion based upon a reasonable degree of psychological certainty that the suicide of Joseph Russell Young, the decedent, was directly and proximately caused by the psychosis he sustained as a result of the automobile accident of June 16, 2010, which is the subject of this action. The layman's term for psychosis would be "insanity".
>
> It is also my opinion based upon a reasonable degree of psychological certainty that at the time of Mr. Young's suicide, the conduct of Mr. Young that resulted in his suicide was due to an irresistible impulse when he was not in his right mind. In other words, he appeared to have a psychotic break with reality (insanity).

It is also my opinion based upon a reasonable degree of psychological certainty that the suicide resulted, not from his own voluntary conduct, but from lack of realization that he was acting on his own psychotic thoughts which were the result of the consequences he suffered from the automobile accident of June 16, 2010.

It is also my opinion based upon a reasonable degree of psychological certainty Mr. Young could not control his irresistible impulses when he committed the act of suicide.

Based upon my review as aforesaid, I have formed an opinion to a reasonable degree of psychological certainty that the suicide of Joseph R. Young was directly related to the accident of June 2010 and had he not had the accident and become disabled, he would still be alive and working.

Further, in Dr. Anderson's Supplemental Affidavit, she addressed her conclusions and the basis for the opinions she had formed, *id.* ¶ 2:

Following Mr. Young's suicide of September 6, 2012, I was then asked to render an opinion as to whether or not at the time of his suicide he was suffering from a psychotic break with reality. After talking with his family members about the night of his suicide, specifically with his wife, Mrs. Jamie Young, who begged the police to either stay with him or take him into custody because his behavior was so erratic and violent, it was indeed my opinion that Mr. Young did suffer from such psychoses at the time of the suicide, and that he had an irresistible impulse when he experienced a psychotic break with reality, which in turn caused his suicide, all as a direct result of the injuries he sustained from the accident of June 16, 2010.

Dr. Anderson continued, *id.*:

Although I received a great deal of additional information after I did my original testing, my opinion has never changed.  [I] was asked to visit the Youngs in their home and subsequently test Mrs. Young and their two daughters in order to render opinions regarding this case.  In order to formulate those opinions, I was provided with further medical documentation, alcohol treatment records regarding Mr. Young and his widow and two daughters, in addition to the visit to the Young residence and scene of the suicide at Chesapeake City, Maryland.

Dr. Anderson also cited a timeline, attached as an exhibit to her Supplemental Affidavit, reflecting "events that occurred from the time of the accident to the time of the suicide which [she] believe[d] were causally related to the accident and acted as great mental stressors."

Anderson Supp. Aff. ¶ 3; *see id.* Exh. 1 (timeline).   In her view, these events "caused Mr. Young's psychotic suicidal condition and set the stage for the suicide."  Anderson Supp. Aff. ¶ 3. The timeline notes, among other events in the year preceding Mr. Young's suicide, his surgery of October 2011; Mr. Young's loss of health insurance in March 2012; a functional capacity evaluation in June 2012; a vocational assessment in August 2012; and an appointment of August 3, 2012, at which time Mr. Young apparently was advised that another surgery would be required.  *See id.* Exh. 1.

Further, at her deposition, Dr. Anderson testified that Mr. Young would fluctuate "from trying to be calm and trying to do everything he was supposed to do and trying to keep his family together," but "then the stress would [to be] get too much and then he would blow up and there would be arguments and fights and he would just start thinking about suicide."  Anderson Dep. at 89.   Dr. Anderson said: "[W]henever the stress got [to be] too much for him, he started thinking about suicide.   And at one point he just cracked."   *Id.*   She acknowledged that the family argument the evening before his suicide was a "triggering event," but, in her view, it was "not causal."  *Id.*

Dr. Anderson opined that, in the absence of the accident and Mr. Young's resulting physical condition, he would not "have committed suicide over an argument with his daughter." Anderson Dep. at 93.   In her view, Mr. Young was not "thinking straight," and was feeling "stressed" and "overwhelmed."  *Id.* at 94.   She testified:  "I think he literally had a psychotic -- he could not think straight.  He could not control himself.  He was out of it . . . .  He wasn't in his right mind."  *Id.*

In its Motion, defendant challenges Dr. Anderson's testimony on several grounds.   In defendant's view, "[t]he fact that Mr. Young killed himself is the only basis for her opinion that

Mr. Young had what she termed a 'break with reality.'"   ECF 32 at 2; *see* Mem. at 14 ("Dr. Anderson's opinions as to the cause of Mr. Young's suicide . . . are not based on anything other than the suicide itself.").   Defendant asserts:   "Dr. Anderson also testified under oath that she simply did not know why Mr. Young committed suicide on September 6, 2012, as opposed to some other night, and had no idea why his impulse to do so was irresistible."   ECF 32 at 2.   And, according to defendant, Dr. Anderson's opinion as to Mr. Young's mental state at the time of his suicide is not based on "sufficient facts or data," nor did she employ "any principle or methodology, reliable or otherwise."   Mem. at 11.

Defendant also seeks to cast doubt on Dr. Anderson's methodology, asserting that her "opinions as to the 'cause' of Mr. Young's suicide are nothing more than conjecture, as they are not based on any psychological or medical assessment other than the suicide itself.   There is no method employed, reliable or otherwise, to substantiate her testimony on that subject."   ECF 32 at 2.   *See also* Mem. at 11 ("Dr. Anderson's opinions are not based on sufficient facts or data, nor is any principle or methodology, reliable or otherwise, employed.").

I am not persuaded that defendant has identified any fatal flaw in Dr. Anderson's methods that would warrant exclusion of her testimony.   As noted, following Mr. Young's suicide, Dr. Anderson reviewed various records, including medical and emergency response records; Mr. Young's autopsy; transcripts from the depositions of Jamie Rose Young, Chelsea Young, Jenna Young, and Joseph Capati, all family members of Mr. Young who were with him for portions of the evening prior to his suicide; and a "police accident report and photographs." Anderson Aff. ¶ 2; *see* Anderson Supp. Aff. ¶ 2.   Dr. Anderson also met with and tested Mr. Young prior to his suicide, in May 2012, and later met with and tested Mr. Young's widow and two daughters following his death.   *See id.*

Notably, defendant does not point to any testimony from any defense expert challenging Dr. Anderson's methodology in reaching her conclusion. Nor does my review of the excerpt from the deposition of psychiatrist and defense expert Neil Blumberg, M.D., which is attached to plaintiff's Opposition, reflect any such criticism of her methodology in determining Mr. Young's mental state at the time of his suicide. Indeed, to the extent Dr. Blumberg addressed Dr. Anderson's methodology, as opposed to her conclusions, he indicated that her approach during the evaluation of Mr. Young completed on May 10, 2012, which is not directly at issue, was "consistent with the relatively brief kind of evaluation that psychologists seem to routinely do for disability determination services." Blumberg Dep. at 25. When asked whether he had any "criticisms about the way she went about meeting with him, testing him and reporting at the time of [the evaluation of May 10, 2012]," Dr. Blumberg said he did not. *Id.* at 26.

It is also worth observing that Dr. Blumberg acknowledged that he was "not sure exactly why" the fight involving Mr. Young's family "became the event that sort of [led] him to make [the] decision" to commit suicide. *See* Blumberg Dep. at 37. Notwithstanding that uncertainty, Dr. Blumberg apparently believed that he had sufficient information to opine that Mr. Young's suicide was not "a result of an irresistible impulse," as Dr. Blumberg did not "believe that [Mr. Young] was insane or that insanity prevented him from thinking or planning this out." *Id.* at 40. In other words, although Dr. Blumberg disagreed with Dr. Anderson's conclusions as to Mr. Young's mental state, he did not identify any ground on which Dr. Anderson's views must be disregarded due to her approach in reaching those conclusions.

Defendant also insists: "The simple fact that [Mr. Young] left a fairly detailed suicide note can lead to only one conclusion—that Mr. Young's suicide was a deliberate act by someone suffering from anxiety and depression." Reply at 7. However, defendant points to no authority

indicating that the existence of a suicide note forecloses a finding of an "irresistible impulse." To the contrary, in *Fuller*, *supra*, the court observed: "A suicide note . . . does not preclude, as a matter of law, a finding that the writer was unable to control his suicidal act[.]"  35 N.Y.2d at 432, 322 N.E.2d at 268 (concluding that evidence was sufficient to permit a jury to find that suicide resulted from an irresistible impulse, where decedent had written two suicide notes, changed his will several days before his death, and obtained a gun).[12]  *See Halko v. New Jersey Transit Rail Operations, Inc.*, 677 F. Supp. 135, 138-43 (S.D.N.Y. 1987) (where decedent recorded a suicide message and had made an earlier suicide attempt, jury question existed as to whether decedent's "state of mind led to an uncontrollable impulse").  And, more generally, several other courts have declined to require that a suicidal impulse arise suddenly in order to qualify as "irresistible."  *See, e.g.*, *R.D. v. W.H.*, 875 P.2d 26, 29 (Wyo. 1994) ("We hold . . . that the impulse does not need to be sudden in order to be characterized as being an irresistible or uncontrollable impulse."); *Orcutt*, 58 Wash.2d 846, 364 P.2d 1102 (jury could find that decedent committed suicide due to irresistible impulse despite evidence of prior suicide attempts).[13]

---

[12] Although the *Fuller* Court observed that recovery might be permissible even in the absence of insanity or proof of an "irresistible impulse," it nevertheless applied the standard "irresistible impulse" test.  *See* 35 N.Y.2d at 429-30, 322 N.E.2d at 266; *see also Peters*, *supra*, 527 A.2d at 1276 n.6 (discussing *Fuller*).

[13] Defendant's reliance on *Sachs v. Little*, 245 Md. 343, 226 A.2d 283 (1967), is misplaced.  The *Sachs* Court, defendant states, held "that testimony from a will contest that the testator was mentally infirm was inadmissible," on the ground that, "under Maryland law, a psychologist must have a sufficient foundation as to a person's mental state on the actual day of an occurrence . . . ."  Mem. at 12.  *Sachs*, however, has no bearing on evidentiary issues, which are governed by federal law.  *See, e.g.*, *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1054 (4th Cir. 1986) ("[T]he admissibility of expert testimony in a federal court sitting in the diversity jurisdiction is controlled by federal law.  State law, whatever it may be, is irrelevant."); *Owens v. Bourns, Inc.*, 766 F.2d 145, 149 (4th Cir. 1985), *cert. denied*, 474 U.S. 1038 (1985) ("Even under diversity jurisdiction the sufficiency of the evidence to create a jury question is a matter governed by federal law."); *see also Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 109 (4th Cir. 1995) ("[T]he Federal Rules of Evidence, as validly enacted procedural rules, govern in diversity cases."); *Brendle's Stores, Inc. v. OTR on Behalf of Bd. of Trustees of State Teachers Retirement*

In connection with defendant's claims regarding the basis of Dr. Anderson's opinion, it maintains that her opinions were inconsistent.  *See* Mem. at 5.  Specifically, defendant points to testimony from Dr. Anderson, *see* Mem. at 12, indicating that, at the time she evaluated Mr. Young on May 10, 2012, "his self-hatred was so great that [she] really thought he could" commit suicide "at any time."  Anderson Dep. at 97.  Likewise, in the Reply, defendant cites Dr. Anderson's May 2012 observation that Mr. Young had been "suicidal" and "depressed," Anderson Evaluation at 7, and insists that Dr. Anderson's evaluation "is devoid of any mention of the motor vehicle accident rendering Mr. Young insane, or any statement that the accident caused Mr. Young to experience certain 'irresistible impulses' to take his life."  Reply at 2.  Dr. Anderson's views as of May 2012, defendant says, are inconsistent with her subsequent opinion that Mr. Young "must have had a 'psychotic break' as he took his own life."  Mem. at 12.

Similarly, defendant emphasizes that Dr. Anderson "testified at her deposition that Mr. Young never exhibited psychotic tendencies until he allegedly had a psychotic break on the night of his suicide," and that, "prior to his suicide, it was her opinion that Mr. Young was so depressed that he could have committed suicide at any time."  ECF 32 at 2.  Indeed, at her deposition, Dr. Anderson testified: "Quite frankly, in the state I saw him in just when I tested him [in May 2012] I thought he could commit suicide at any time.  You know, he was so depressed and he felt like he ruined his family, and he lost his family.  And his self-hatred was so great that I really thought he could do it at any time."  Anderson Dep. at 96-97.

---

*System of Ohio*, 978 F.2d 150, 157 (4th Cir. 1992) ("A federal court exercising diversity jurisdiction applies federal law to determine whether there is sufficient evidence to submit a question to a jury.").  In any event, the *Sachs* Court deemed expert testimony inadmissible on grounds distinct from those raised here, including, *inter alia*, that although "the evaluation of a testator's competence must be made upon all the available evidence," the expert in that case "had only considered a part of such evidence."  *See*  245 Md. at 362-63, 226 A.2d at 293.

In Dr. Anderson's Supplemental Affidavit, she addressed defendant's assertion that she "switched [her] opinion when [she] stated Mr. Young had not exhibited psychotic tendencies prior to his suicide but that he did on the night of the suicide." *Id.* ¶ 5.  In particular, she averred, *id.*:

> Mr. Young was not psychotic at the time I tested him.  However on the night of the suicide he did become psychotic and this was verified by the statement of his family members.  It is not a contradiction for someone not to be psychotic at one time and then to have a psychotic episode as a result of an irresistible impulse at another time because of overwhelming pressure.  His medical condition steadily deteriorated between the time I tested him and the time of the suicide.

A jury may well conclude that Dr. Anderson is not credible because of inconsistencies, or that her deposition testimony undermines her conclusion that Mr. Young's suicide resulted from insanity or an "irresistible impulse," rather than from other causes, including Mr. Young's ongoing depression.  Nevertheless, at this stage, defendant has not established how Dr. Young's statements, as a matter of law, bar her from opining that Mr. Young suffered from insanity or an "irresistible impulse" at the time of his suicide.

To the extent defendant identifies any genuine inconsistency between Dr. Anderson's opinions as of May 2012 and those following Mr. Young's suicide, that subject would be an appropriate basis for "vigorous cross-examination."  *Moreland*, *supra*, 437 F.3d at 431.  *See also, e.g.*, *Fuller*, 35 N.Y.2d at 431, 322 N.E.2d at 267 (an expert's "failure before the suicide to diagnose [the decedent] as mentally ill affects the weight but not the admissibility of [the expert's] testimony").  However, defendant has failed to show how any inconsistency compels the exclusion of the challenged portion of Dr. Anderson's testimony.

In its Motion, defendant also insists that "Dr. Anderson did not hold the opinion that Mr. Young had a psychotic episode until she was advised by Plaintiff's counsel as to the type of testimony that would [be] required to defeat the instant Motion."  ECF 32 at 2; *see* Mem. at 11-

12.  According to defendant, "[d]uring her deposition, it became apparent that Plaintiff's counsel advised Dr. Anderson as to what her opinions should be in order for him to make out his clients' claims."  Mem. at 3.  To that end, defendant cites the following deposition testimony, Anderson Dep. at 88:

> [Defense counsel]: What did you mean [in ¶ 4 of the Anderson Affidavit] by an "irresistible impulse"?
>
> [Dr. Anderson]: Well, you know, [plaintiff's counsel] told me that that was a term that the court used, and did I think that that was true.  Could I honestly say that I thought it was an irresistible impulse, and I said yes. I think that whenever the stress got too much for him, he started thinking about suicide.  And at one point he just cracked.

In Dr. Anderson's Supplemental Affidavit, she squarely rejected defendant's arguments concerning the influence of plaintiff's counsel on her opinions.  She said, *id.* ¶ 4:

> Opposing counsel suggests that I did not hold the opinion that Mr. Young had a psychotic episode until I was advised by [plaintiff's counsel] as to the type of testimony that would be required to defeat the motion.  This is false.  Long before meeting with [plaintiff's counsel], I interviewed and tested Mrs. Young and her two daughters.  All of them described a change in his behavior for the worse.  He had become angry, irrational, critical, and cruel.  All family members stated his behavior was completely unlike it had been before . . . .

Regarding the issue of the influence of plaintiff's counsel, *Mack v. AmerisourceBergen Drug Corp.*, 671 F. Supp. 2d 706 (D. Md. 2009) (Bennett, J.), is instructive.  In that products liability action, the defendants filed a motion for summary judgment and a motion to exclude the testimony of three of the plaintiffs' experts, including Dr. Donald H. Marks.  *Id.* at 708.  The defendants challenged the admissibility of Dr. Marks's testimony on several grounds, including that "Dr. Marks was merely a 'mouthpiece' for plaintiffs' counsel, as his testimony was largely shaped by Plaintiffs' counsel."  *Id.* at 710.  Dr. Marks "admitted that the content of his expert report was mostly drafted by Plaintiffs' counsel and that counsel selected the supporting exhibits."  *Id.* at 711.  The district court observed: "The degree of attention and care that Dr.

Marks applied in developing the report appears to be minimal.  Indeed, Dr. Marks testified that he actually disagreed with a section in the report entitled 'Medical Necessity Not Established,' but that he did not catch the error when he initially reviewed counsel's draft."  *Id.*  Notwithstanding the role of plaintiffs' counsel, the *Mack* Court declined to exclude Dr. Marks's testimony on that basis, and instead deemed counsel's role to be an appropriate subject for cross-examination:  "While this influence does not undermine the admissibility of [Dr. Marks's] testimony, it may undermine its weight and credibility—matters that may be revealed by Defendants through cross-examination."  *Id.* at 712.

The district court explained, *id.* (omissions in *Mack*):

> Opposing attorneys rely upon cross-examination to expose the influence that a hiring attorney has upon an expert's testimony.  *See Elm Grove Coal Co.* [*v. Director, O.W.C.P*, 480 F.3d 278, 301 n.23 (4th Cir. 2007)] ("The interplay between testifying experts and the lawyers who retained them . . . [is] fair game for cross-examination.") . . . . [C]ross-examination is the principle means of ensuring that the truth finding process at trial is preserved in the present circumstances—that is, when an attorney plays a proactive role in shaping an expert's testimony.  *See, e.g.*, *Musselman* [*v. Phillips*, 176 F.R.D. 194, 201 (D. Md. 1997)]; *Lamonds v. General Motors Corp.*, 180 F.R.D. 302, 306 (W.D. Va. 1998) (noting that even where an expert is qualified under *Daubert*, "[i]t can be important for the trier of fact to know whether the expert arrived at his opinions after an independent review of all relevant facts or whether he relied on 'facts' chosen and presented by an attorney advocating a particular position"); *Karn v. Rand*, 168 F.R.D. 633, 639 (N.D. Ind. 1996) ("[T]he impact of expert witnesses on modern-day litigation cannot be overstated; yet, to some, they are nothing more than willing musical instruments upon which manipulative counsel can play whatever tune desired . . . Thus, full, effective cross examination is critical to the integrity of the truth-finding process." (citations omitted)).

Again, the interactions between plaintiff's counsel and Dr. Anderson, about which defendant complains, may be an appropriate subject of cross-examination.  However, I am not persuaded that defendant has established how such discussions require the exclusion of Dr. Anderson's testimony.

Defendant has failed to identify any ground on which Dr. Anderson's testimony regarding Mr. Young's state of mind at the time of his suicide must be excluded as a matter of law.  To be sure, defendant has pointed to a host of issues that it could raise in the course of "vigorous cross-examination" of Dr. Anderson and through the testimony of its own expert witnesses.  Indeed, due in part to the very aspects of Dr. Anderson's testimony that defendant cites in its Motion, a jury may well find unpersuasive her conclusions as to Mr. Young's mental state.  Nevertheless, as the Maryland Court of Special Appeals made clear in *Sindler*, whether the decedent "was insane or delirious and that suicide resulted, not from her own voluntary conduct, but from lack of realization or an 'uncontrollable impulse' that was the product of insanity created by appellees, was a jury question that required expert testimony."  166 Md. App. at 119, 887 A.2d at 113.

In *Sindler,* the plaintiff offered *no* expert testimony that shed light on the relevant question:  the decedent's state of mind at the time of her suicide.   As a result, the *Sindler* Court concluded that, due to "the date of [expert witness Dr. Lefer's] report and deposition, he could not have and did not opine that the suicide was caused by the accident."  *Id.* at 121, 887 A.2d at 115.  And, "Dr. Lefer did not opine that Ms. Sindler was insane or otherwise was in a mental state such that she did not realize the nature and risk of her act of suicide or that she had an uncontrollable impulse or anything sufficiently close to the Restatement test to create a jury question."  *Id.*   In contrast, plaintiff here has offered sufficient evidence, in the form of Dr. Anderson's opinion testimony, to create a jury question.  Therefore, defendant is not entitled to partial summary judgment as to the wrongful death counts.

### V.  Economic Losses Postdating September 6, 2012

In its Motion, defendant also asks this Court to enter judgment in its favor as to any economic loss alleged to have occurred after September 6, 2012, the date of Mr. Young's suicide.  *See* Mem. at 15-16; Reply at 10-11.  In her Opposition, plaintiff states that she "agrees that if the Court were to grant [] summary judgment as to the legal sufficiency of the proximate cause of the suicide, then this evidence would be properly excluded."  Opp. at 26.  However, plaintiff insists that she "has demonstrated a triable issue of fact as to whether the suicide was proximately caused by the accident."  *Id.*

Defendant's argument pertaining to economic losses occurring after September 6, 2012, turns on the Court's resolution of the first issue—defendant's motion for summary judgment as to the wrongful death counts.  Because I decline to grant defendant's Motion in that regard, and because defendant has not identified any independent grounds for the relief sought, judgment in its favor as to this issue is unwarranted.

### VI.  Conclusion

For the foregoing reasons, defendant's Motion is granted in part and denied in part.  A separate Order follows, consistent with this Memorandum Opinion.


Date:   May 30, 2014                                  _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge